UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| TAMMY KOHR and EUGENE STROMAN, on behalf of themselves and all others similarly situated, and ROBERT COLTON,<br><br>                              Plaintiffs,<br><br>           v.<br><br>CITY OF HOUSTON,<br><br>                              Defendant. | Civil Action No. 17-cv-1473 |

## COMPLAINT

1.      Hundreds of unsheltered homeless people live on the streets of Houston. At night, there is no place for them to turn, because Houston's emergency shelters are full. Demand is so high at shelters that people wait in line just to try to get a spot to sleep on the floor. Those who wind up stuck on the streets do their best to shelter themselves by "camping" in tents or other temporary structures.

2.      In an effort to sweep the evidence of homelessness from sight, the City of Houston has made camping or possessing too much property in public a crime. But homeless people who live on the streets don't have a choice about whether to comply with this law. They must meet their basic human need for shelter, and the only alternatives—emergency shelter beds—are full beyond capacity. Without permanent shelter, they have nowhere to store their few remaining possessions.  Houston's camping ban effectively criminalizes homelessness in violation of the Constitution.

3.      To make matters worse, Houston's camping ban was passed together with a ban on panhandling in many public areas of the city. Panhandling is, like the act of seeking shelter, life-sustaining conduct for many homeless people in Houston. This law literally silences homeless Houstonians in order to shield more fortunate people from speech that makes them uncomfortable. Restricting the speech of Houston residents who are in the most serious need is a blatant violation of the First Amendment.

## JURISDICTION AND VENUE

4.      This is a civil rights action arising under 42 U.S.C. § 1983 and the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and § 1343 (civil rights jurisdiction).

5.      Venue in this district is proper under 28 U.S.C. § 1391(b)(1), because the City of Houston resides in this district, and under § 1391(b)(2), because a substantial part of the events giving rise to the Plaintiffs' claims occurred in this district.

## FACTS

**I.      Plaintiffs Are Unsheltered Homeless People Whose Rights Are Violated by the Camping Ban and Panhandling Ban**

**A.      Tammy Kohr**

6.      Tammy Kohr has lived in Houston for the last five years. During that time, she has been in and out of homelessness. She moved to Houston to get far away from her abusive ex-husband, and she lost her most recent job when she went back to her home state to testify at his parole hearing. Despite her best efforts, she hasn't been able to maintain steady housing since. Tammy was recently diagnosed with cancer.

7. Tammy lives in a tent in an encampment. Having a tent is important to protect her from the weather, insects, and other pests. She also uses her tent to get dressed in the morning and to keep her possessions safe. She likes having a tent to have privacy from other people.

8. Tammy is not sure how to prepare for enforcement of the camping ban. The main thing she is concerned about losing is her dignity.

9. Soon after the ban was signed into law, officers served notice that it would be enforced at her encampment. Though different officers have been giving Tammy different information, one officer said a dump truck will come through the camp, and officers will grab anything that violates the ban and throw it into the dump truck. Another officer said that people in encampments will be required to choose property they want to discard and throw it into the dump truck themselves.

10. Tammy does not have access to her own private space where she can store her possessions. She is in the process of choosing which of her possessions she will keep, and which the City will take indefinitely. She is worried about losing her clothes, her mattress, and her cooler that she uses to keep drinks and meat cold. She does not know what will happen to her kitten. Most importantly, she is worried about losing her bike, which she and her boyfriend use to travel to job interviews, to housing assistance offices downtown, to shower facilities downtown and at Herman Park, and to places that distribute food. Tammy does not have money to take the train or the bus, especially since she has stopped panhandling.

11. Tammy isn't voluntarily in public: she cannot access an emergency shelter bed. She has tried calling and waiting in line, but the shelters are always full. Tammy managed to get an overflow spot at a Star of Hope shelter once, about five years ago, after waiting in line for two hours. She got bedbug bites after sleeping on the floor.

12.    Tammy used to panhandle with signs that said things to make people smile. Sometimes, she would panhandle near gas stations or ATMs, and she regularly stepped into the street to accept money from people in cars.

13.    Tammy used to respectfully and briefly persist if people said no to her, to explain why she was asking for money. People often decided to give her money when they heard what she was asking for. It was important to Tammy that these people watch her buy what she had been saying she needed, because that makes people more likely to give to the next person in the future, and changes their point of view about why homeless people might ask for money in the first place. Tammy also wants to correct the misperception many people have that it is actually illegal for them to give money directly to a person on the street.

14.    Tammy doesn't panhandle anymore—she has been harassed by police officers, who claim that it is illegal to be asking for money, too many times. She fears that the police may arrest her for violating each provision of the panhandling ban in the course of her typical panhandling activities.

**B.    Eugene Stroman**

15.    Eugene Stroman lives with his wife in an encampment. He has a pet dog and he likes to barbeque. Gene makes money repairing bikes with spare parts he stores next to his tent. Despite his best efforts, Gene has not been able to find stable housing. He uses his tent for protection from the weather and insects, as well as rats, opossums, and raccoons.

16.    Gene is baffled about how to prepare for enforcement of the camping ban. Soon after the ban was signed into law, officers served notice of enforcement on Gene's encampment. Officers have come through Gene's encampment throughout the last week to tell people to prepare for enforcement.

17.    Gene does not have access to his own private space where he can store his possessions. He and his wife have started sorting through their possessions, but they can't decide what to keep. They have winter clothes that they would like to hang on to, but the clothes are bulky. Gene will probably have to give up his nonperishable foods, including canned goods. Gene is also worried that he will have to relinquish all his spare bike parts, and he won't be able to make any more money from repairs.

18.    Gene is most worried about losing his bike, which helps him get around town. Having a bike is important to Gene, because he has congestive heart failure, and he gets weak when he walks too far. He needs a bike to get to the Houston Housing Authority and a food pantry he visits. Without income from repairing bikes, Gene isn't sure how he will be able to afford bus fare.

19.    Gene isn't voluntarily in public: he cannot access an emergency shelter bed. He has repeatedly tried calling and waiting in line, but all the emergency shelter beds are full. Moreover, there is no available shelter that would accept Gene and his wife together—going into shelter means that they will be forced to separate.

20.    Gene once got an overflow spot in a shelter. He had to sleep on a mat on the floor in the kitchen, where he was bothered so much by the rats that he had to feed them in order to get them to leave him alone. His eyeglasses were stolen. He was harassed by the staff because he is not Christian, and staff members would tell him that he was going to hell. He also had trouble searching for a job while he stayed at the shelter, because he had to be in line by 2:00 PM to make sure he got a bed.

21.    About seven months ago, Gene had enough money to catch the train to Star of Hope Men's Shelter. He took the train uptown, walked to Star of Hope, and waited in line, but

even after he waited, the shelter turned him away. The trip had been so taxing on Gene that he didn't have the energy to travel back home. He had to sleep at the train station near the shelter.

22.     Of course, the other emergency shelter for men—the Salvation Army Men's Shelter—is even further away from Gene's encampment than the Star of Hope Men's Shelter. It is very difficult for Gene to travel to these shelters and wait in line, only to get turned away and stuck sleeping, without his possessions, in an unfamiliar part of town.

### C.     Robert Colton

23.     Robert Colton is a veteran who has been in and out of homelessness for the last five years. Right now, he is living in a tent, trying to get a steady income and access to affordable housing. Robert has trouble supporting himself with full-time employment due to multiple disabilities, including posttraumatic stress disorder and a hernia that requires an operation.

24.     Robert usually panhandles near outdoor restaurants, parking meters, and ATMs with a sign that says "Homeless vet needs help with food, clothes, $, anything helps." Sometimes, he steps into the street to accept money from people in cars.

25.     Robert wants to communicate with passers-by about the fact that many homeless people have fallen on bad times, and when they ask for money, they are only trying to have a better life. He knows from his experience on the street that many police officers arrest panhandlers to keep them out of highly visible areas, and the new speech restrictions are just the latest version of laws authorizing the police to take homeless people to jail. He feels hesitant to continue panhandling because the police may arrest him for violating each provision of the panhandling ban in the course of his typical panhandling activities.

D.    **Defendant City of Houston**

26.    Defendant City of Houston is a municipality organized under the laws of the State of Texas.

II.    **The Camping Ban Criminalizes Homelessness**

27.    On March 2, 2017, Mayor Sylvester Turner announced a six-point plan for furthering Houston's nationally recognized success in reducing homelessness. Mayor Turner stated that his vision was to "balance the needs of the homeless and the concerns of the neighborhoods they impact."

28.    The plan includes many evidence-based and compassionate policy choices, like expanding permanent supportive housing, and seeking additional funding for mental health and substance abuse treatment. But some aspects of the plan strike an unconstitutional "balance," allowing complaints from more fortunate constituents to outweigh the rights of their homeless neighbors. These aspects are a ban on encampments and an "aggressive anti-panhandling campaign."

A.    **The Camping Ban Criminalizes Use of a Tent and Accumulation of Certain Possessions in Public**

29.    One point of Mayor Turner's plan is to "compassionately redirect those in encampments" from "unacceptable locations" to "temporary, low-level shelters." The Mayor announced his intention to add more than two hundred emergency shelter beds by August, and in the meantime, to build an unspecified number of temporary shelters that house approximately seventy-five people. The Mayor also announced his intention to introduce an ordinance "outlawing tents or structures on public property."

30.    To the Mayor's credit, he repeatedly emphasized that people cannot be "redirected" if there is no place else to go. He stated candidly: "one of the reasons we are

7

creating these temporary, low-level shelters, is that once we tell people no, you cannot be *here*, we also need to provide them with where they *can* be."

31.    The City of Houston has not constructed any new shelters since the Mayor's announcement. Nevertheless, the City intends to enforce the camping ban starting this weekend.

32.    The camping ban prohibits "unauthorized use of . . . a tent or other temporary structure for living accommodation purposes or human habitation" in public. Houston Code of Ordinances §§ 21-61 to -62.

33.    The camping ban prohibits "unauthorized use of . . . a camp stove, grill, heater, or other container or device capable of generating or containing an open flame" in public. *Id.*

34.    The camping ban prohibits "unauthorized accumulation of personal property (other than durable medical equipment) that would not fit in a container three feet high, three feet wide, and three feet deep" in public. *Id.*

35.    An officer may ticket people for these offenses after issuing a written warning and allowing a reasonable time to comply. *Id.* § 21-63. An officer may arrest people for these offenses if she issues the written warning, "attempt[s] to ascertain" whether the person may need emergency medical care or social services, and, if so, makes a "reasonable effort" to obtain assistance from the Houston Police Department Homeless Outreach Team or a designated outreach organization. *Id.* Nevertheless, arrest is permitted for someone who seems to be in need of services if the arresting officer could not obtain outreach assistance, or outreach assistance "direct[s]" the person to an appropriate provider, and the person "has not accepted the direction." *Id.*

36.    There are very few people employed as active street outreach providers in Houston. It is likely that officers' requests for outreach assistance will go unanswered, especially

late at night and on weekends, which may give officers the green light to arrest someone for camping.

37.    It is unclear what happens if an outreach provider directs a person to shelter, but no shelter is available—as will inevitably happen in many cases.

38.    It is unclear what happens if an outreach provider directs a person to shelter, and because of mental health issues, they are not able to follow that direction.

**B.    Houston's Unsheltered Homeless Population is Involuntarily in Public**

39.    According to the most recent and comprehensive data that are publicly available, there are more than 1,000 unsheltered homeless people in Harris County, the majority of whom are in Houston. That was the statistic reported in the 2016 Point-in-Time Count.

40.    The annual Point-In-Time Count organized by the Houston Coalition for the Homeless is the most comprehensive count of unsheltered homeless people that exists. To conduct the Count, agency staff and volunteers walk around Houston in late January to count all the unsheltered homeless people they can find. The Count is underrepresentative of the true number of unsheltered homeless people in Houston.

41.    Finding housing from a state of homelessness is a long process with many setbacks. For example, more than 28,000 families in Houston are on the waitlist for a Housing Choice Voucher, which is a federal program that helps low-income families pay for an apartment. In late April, due to budget cuts, these vouchers were rescinded from about 900 families in Houston who had finally made it to the top of the waiting list. Some of these families had already signed a lease, and watched their long-awaited apartment slip through their fingers.

42.     A temporary alternative to finding housing is an emergency shelter bed. Emergency shelter beds are what most people think of when they think of homeless shelter. In theory, anyone who is homeless should be able to access these beds on an as-needed basis.

43.     The Way Home, Houston's Continuum of Care program designated by federal law to coordinate local homeless assistance services, refers homeless adults to emergency shelter beds in five different shelters:

   a. Star of Hope Men's Shelter (aka "Men's Development Center"),
   b. Star of Hope Women and Families Shelter,
   c. Salvation Army Men's Shelter (aka "Red Shield Lodge"),
   d. Salvation Army Family Shelter, and
   e. Salvation Army Single Women's Shelter (aka "Sally's House").

44.     The emergency shelter beds in Houston are full, and they have been full for years. The number of unsheltered homeless people in Houston far exceeds the number of available emergency shelter beds.

45.     City policymakers know that the emergency shelter beds are full. That is why the Mayor proposed building hundreds of additional emergency shelter beds as part of his plan.

46.     The shelters are full so consistently that every shelter with emergency beds has a designated number of "overflow" spots. People in overflow spots are required to sleep lined up on the floor in whatever floor space is available. Sometimes, people spill into the kitchen.

47.     This practice is unsanitary, because the emergency shelters are only built to house one person per bed. The emergency shelters have dozens of overflow clients sleeping on the floor without adequate staff or bathrooms to serve that client population.

48.     The practice is also unsafe, because it poses a fire hazard to everyone sleeping inside the shelter.

49.     Putting these concerns aside, the overflow spaces are nowhere near sufficient to accommodate Houston's unsheltered homeless population. Each day, people wait in line outside each of the five emergency shelters at designated times in the morning and afternoon, and people in line are turned away for lack of space.

50.     Even if each shelter squeezed overflow clients onto every square inch of their floor space, which would be unsafe and unsanitary, the floor space in these shelters could not physically accommodate the hundreds of unsheltered homeless people in Houston.

51.     On the rare occasion when an emergency shelter bed opens up, it isn't necessarily "available" to any unsheltered homeless person. There are many barriers that, on their own or in combination, can make it impossible or unreasonably onerous for people to access shelter.

52.     Cost is a barrier. At the Salvation Army Men's Shelter, men are required to pay $10 a day after their first seven days in an emergency shelter bed. Most homeless people cannot afford this amount, especially given the new restrictions on panhandling.

53.     Criminal history is a barrier. None of the Salvation Army shelters, and none of the shelters that accept families, accept people who are registered sex offenders.

54.     Identification is a barrier. Some shelters require government-issued identification in order to enter, which is impossible for people who lack identification. Getting identification can be a difficult process, depending on where you were born. It often requires obtaining certified medical records, school records, social security records, and/or birth certificates.

55.     Employment is a barrier. Holding or searching for a job makes it difficult or to access emergency shelter beds. All shelters offering emergency beds require clients to wait in line for a spot at some point during the day. Waiting in line during the day is difficult for people who are searching for work, and impossible for someone who works an overlapping day shift.

Sometimes, people face the choice of standing in line for emergency shelter or accepting a temporary job placement through Pacesetters, a temporary employment agency. Shelters also require clients to check in by the early- to mid- evening, which is impossible for someone who works the night shift, or works late and needs to take a bus ride across town to the shelter.

56.    Health and safety concerns are a barrier. Every emergency shelter is infested with bedbugs, and people come out of shelters covered in bedbug bites.

57.    Travel is a barrier. The Wheeler encampment is about 22 minutes walking from the Salvation Army Family Residence, 1 hour and 25 minutes walking from the Salvation Army Men's Shelter, and 1 hour from the remaining shelters. The Minute Maid encampment is 30 to 45 minutes walking from the Salvation Army Family Residence and Men's Shelter, respectively. Anyone who goes to a shelter to wait in line needs to carry their possessions with them, or else hide their possessions and hope they won't be stolen. It is extremely difficult for people with mobility impairments, and no money for public transportation, to wait in line at shelters every day on the off chance they might get a spot.

58.    Mental health problems and addiction are additional barriers to accessing shelter. People with alcoholism are kicked out of shelters for being visibly intoxicated. People with mental health issues that manifest as aggression can be kicked out of shelters for getting into fights; in the case of paranoia, untrained shelter staff may perceive negative reactions to simple requests, like a request for identification, as a safety threat. And mental health problems can be an obstacle to connecting with shelters in the first place. As the Mayor himself acknowledged, for people with severe and untreated mental illness, "even with everything we are doing, there will still be people—and I don't want to say choose to be on the street—but there will still be people who will be on our streets because of their status."

59.     Desire for freedom is a barrier. Each emergency shelter prohibits people from leaving the shelter from check-in time, which is in the early evening, to check-out time, which is in the early morning. While the shelter does not physically prevent people from leaving, anyone who leaves is not allowed back inside.

60.     Health and safety concerns are a barrier. Every shelter is infested with bedbugs. People come out of shelters covered in bed bug bites. Lining overflow clients up on the floor is also a fire hazard.

61.     Property ownership is a barrier. Shelters also limit how much property a person can have to one or two suitcases. People are required to surrender their property to the shelter, including cell phones, and the shelter locks them away. It is also not uncommon for property to be stolen or accidentally returned to the wrong person. For a homeless person, having one of your few remaining possessions stolen—like a cell phone—can be devastating.

62.     Family structure is a barrier. The Star of Hope shelters regularly split up opposite-sex couples, even married couples with children, and send fathers and their teenage sons to the men's shelter. The result is that married couples, and mothers and sons, must separate from one another if they wish to access emergency shelter beds.

63.     Altogether, these barriers, whether standing alone or in conjunction, make shelter beds functionally unavailable to many unsheltered homeless people in Houston.

64.     Unsheltered homeless people in Houston are not in public by choice. By criminalizing possession of certain property in public, the camping ban effectively prohibits unsheltered homeless people from possessing that property at all. And by criminalizing the basic human need of sheltering oneself while in public, the camping ban effectively criminalizes homelessness altogether.

## II.    The Panhandling Ban Criminalizes Life-Sustaining Speech Based Solely on Its Disfavored Viewpoint

65.    Another point of Mayor Turner's plan is "taking aim at panhandling" with an "aggressive anti-panhandling campaign." The Mayor specified that his goal was to "reduce and/or eliminate panhandling."

66.    As a part of this campaign, the Mayor announced that Houston would engage in extensive speech, including street signs, billboards, and TV, radio, print, and social media ads discouraging direct donations to homeless people.

67.    At the same time, the Mayor announced his intention to pass a new law, now codified at Houston Code of Ordinances §§ 28-46, 40-27, which restricts speech *encouraging* direct donations to homeless people.

68.    The new law thus restricts expression of a dissenting viewpoint by those who are directly affected by the Mayor's campaign: people experiencing homelessness.

69.    More importantly, the law restricts speech that is often life-sustaining conduct. Panhandling can make the difference between eating and going hungry, accessing fresh water or going without, or getting enough money to shelter oneself in a cheap motel room. By restricting panhandling, the City is burdening one of the few options for survival that unsheltered homeless people have left.

70.    The law restricts speech with content that qualifies as "solicitation," defined so broadly that it sets no clear bounds:

> *Solicitation* means the act of panhandling by seeking through a communication with another person, whether by gesture or verbally, funds or goods for food, personal favors (such as trips, transportation, clothing, or other), drink, lodging, vehicle fare, or any other purpose to directly benefit an individual or his family members.

14

§ 28-46(a).

71.    The law prohibits this speech within eight feet of any "ATM, pay telephone, parking meter, parking fee collection box, transit facility, fuel dispensing device, or outdoor dining establishment, including, but not limited to, a sidewalk cafe." § 28-46(d) ("**buffer provision**").

72.    The law also prohibits this speech within eight feet of any person who gives an "imperative instruction, whether verbal or non-verbal," telling the speaker to stop. § 28-46(a). The speaker is required to "[i]mmediately . . . discontinue," and back more than eight feet away if she wishes to continue engaging in her protected speech. § 28-46(b) ( "**silencing provision**").

73.    Finally, the law puts special restrictions on speech in a roadway, permitting people to block traffic to ask for donations to a charitable organization, but prohibiting people from blocking traffic to engage in speech with any other content. § 40-27(b) ("**roadway provision**").

74.    Each of these provisions applies to speech in public spaces throughout Houston, such as sidewalks, roadways, and parks, where the right of the people to express and exchange ideas is at its most robust.

75.    As Mayor Turner suggested when he introduced his anti-panhandling campaign, these speech restrictions are not designed to advance any legitimate government interest. They are designed to silence panhandlers and drive them away from visible areas in Houston.

76.    The City Council debate over these two laws revealed community hostility to people experiencing homelessness. One councilmember characterized many people in encampments as criminals to be eradicated, claiming that "38%" of people in encampments are "con artists." Referring to taxpayers who chose to live in his district, the councilmember

complained that these more fortunate people have to "walk out on Saturday and Sundays, and look at [people experiencing homelessness] day after day, night after night, weekend after weekend."

77.     A Museum Park District board member testified that when she saw tents popping up in the park, she started asking for ordinances to put a stop to it. She referred to people in tents as having a criminal element, and complained that no one would walk in the park as long as people in tents were there.

78.     Despite these characterizations of people experiencing homelessness as criminals, the City Council did not receive or discuss any evidence of a specific public safety issue resulting from the speech that they voted to criminalize.

79.     When a member of the public asked why there was no restriction specific to solicitation in the roadway provision, the Mayor responded: "There's a very thin line between penalizing speech. It was shifted to Transportation because you're dealing with the action that impedes public safety, which is much more defensible. That's the reason why we made the switch."

80.     Of course, this public safety rationale is a sham, because the roadway provision makes an exception for solicitation that the City does not consider to be objectionable. In fact, the City Council took time to express pride in some people who solicit in roadways, including the firefighters who "stand outside and collect change day in and day out." The City Council meeting paused for applause.

81.     The general tenor of debate over these speech restrictions makes it clear that the restrictions are not designed to address a specific public safety issue. Instead, they are designed to shield more fortunate Houstonians from the discomfort of being confronted with the needs of

their neighbors living in extreme poverty, and to restrict speech advocating for direct donations to people experiencing homelessness.

82.    These unnecessary speech restrictions impose a substantial burden on Plaintiff Tammy Kohr's and Robert Colton's speech.

## IV.    Class Action Allegations

83.    Plaintiffs Tammy Kohr and Eugene Stroman bring this action on behalf of themselves and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure. They seek to represent the following class:

> All people in Houston who lack a fixed, regular, and adequate nighttime residence, who have been served with a written warning under Houston Code of Ordinances § 21-63 (Procedure for Enforcement).

84.    This action is brought and may properly be maintained as a class action under Rule 23(a)(1)–(a)(4) and Rule 23(b)(2).

### A.    The Proposed Class Satisfies Rule 23(a)

85.    Members of the proposed class are so numerous that joinder is impracticable. Over sixty unsheltered homeless people in at least two encampments have been served with a written warning.

86.    Joinder is also impracticable because membership in the large proposed class is fluid. People enter and leave the proposed class every day. Monitoring for these changes, and joining and dismissing plaintiffs repeatedly, would not be a practical way to manage this litigation.

87.    The relief sought is common to all members of the proposed class, and common questions of law and fact exist as to all members of the classes. Plaintiffs seek prospective relief from enforcement of the camping ban on a classwide basis.

88.    Among the most important, but not the only, common questions of law and fact are:

a.    Does the number of unsheltered homeless people in Houston exceed the number of available emergency shelter beds?

b.    Is sheltering oneself unavoidable because it is a basic human need?

c.    Is it reasonable to search and seize private property on the sole basis that it does not fit in a three-foot cube?

d.    Is prospective relief appropriate to stop the City of Houston from violating the Plaintiffs' rights?

89.    The named Plaintiffs' claims are typical of the claims of the proposed class members, and they have the same interests as all other members of the proposed classes that they represent. The named Plaintiffs' claims arise from the same course of conduct as claims of the proposed classes, and their claims are based on the same legal theories as those of the proposed classes.

90.    The named Plaintiffs are adequate representatives of the proposed classes because they are members of the classes and because their interests coincide with, and are not antagonistic to, those of the classes.

91.    Tammy Kohr and Eugene Stroman are familiar with the City of Houston's ordinances and practices challenged here and the constitutional protections they seek to vindicate. They are prepared to respond to discovery requests in this case. They are committed to fulfilling the role and duties of a class representative protecting the fundamental constitutional rights of Houston's unsheltered homeless population.

92.    The named Plaintiffs are represented by lawyers associated with the American Civil Liberties Union of Texas. Affidavits from Plaintiffs' counsel describing their qualifications

will accompany a motion for class certification. The named Plaintiffs and their attorneys will fairly and adequately protect the interests of the members of the Class.

## V.    General Applicability, Rule 23(b)(2)

93.     Class action status is appropriate because the City has acted and refused to act on grounds generally applicable to the proposed class. The City's ordinances apply equally to the class regardless of differences among class members.

94.    Plaintiffs seek final injunctive and declaratory relief protecting them from violation of their constitutional rights.

95.    Injunctive and declaratory relief with respect to each claim would be appropriate to the class as a whole. All members of the proposed class are entitled to the constitutional protections Plaintiffs seek to enforce.

## VI.    Predominance and Superiority, Rule 23(b)(3)

96.    The predominant questions in this case are whether municipal policies violate the proposed class members' constitutional rights. This question is susceptible to generalized, class-wide proof. There is no individualized evidence or legal argument required to succeed on such a claim.

97.    A class action is superior to alternative methods of trying individual claims. In this case, there is no realistic alternative for members of the proposed classes to try their claims. As unsheltered homeless people, members of the proposed classes are not likely to be able to invest the resources necessary to retain an attorney or bring their claims pro se.

### CLAIMS FOR RELIEF

### Count One: Right Against Cruel and Unusual Punishment
### 42 U.S.C. § 1983 and Eighth Amendment to the U.S. Constitution

98.    Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

99.    Plaintiffs Tammy Kohr and Eugene Stroman bring this claim against the City of Houston on behalf of themselves and members of the proposed class.

100.    Unsheltered homeless people in Houston, including Tammy Kohr and Eugene Stroman, are involuntarily in public. They have no place else to go.

101.    Sheltering oneself is not voluntary conduct. It is a basic human need, it is harmless, and it is an act integral to the status of homelessness.

102.    By punishing the act of sheltering oneself in public, Houston's camping ban effectively punishes the status of homelessness.

103.    In the absence of prospective relief, Plaintiffs and class members are likely to be ticketed and arrested in violation of their right against cruel and unusual punishment. On behalf of themselves and the prospective class, Plaintiffs Tammy Kohr and Eugene Stroman seek declaratory and injunctive relief against the City of Houston.

## Count Two: Right to Free Speech
## 42 U.S.C. § 1983 and First Amendment to the U.S. Constitution

104.    Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

105.    Plaintiffs Tammy Kohr and Robert Colton bring this claim on behalf of themselves as individuals.

106.    "Solicitation" restricted by the buffer provision and the roadway provision is protected speech under the Free Speech Clause of the First Amendment.

107.    The buffer provision, the silencing provision, and the roadway provision draw distinctions based on the message a speaker conveys. They are content-based restrictions on speech in a traditional public forum.

108.     These provisions are not the least restrictive means of achieving a compelling government interest. They were adopted to restrict expression of a dissenting viewpoint, and to shield more fortunate Houstonians from the discomfort of a panhandler's message.

109.     The buffer provision, the silencing provision, and the roadway provision violate the Plaintiffs' right to free speech under the First Amendment to the United States Constitution.

110.     In the absence of prospective relief, Plaintiffs are likely to either refrain from protected speech, or else be ticketed and arrested in violation of their right to free speech. Plaintiffs Tammy Kohr and Robert Colton seek declaratory and injunctive relief against the City of Houston.

**Count Three: Void for Vagueness**
**42 U.S.C. § 1983 and Fourteenth Amendment to the U.S. Constitution**

111.     Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

112.     Plaintiffs Tammy Kohr and Robert Colton bring this claim on behalf of themselves as individuals.

113.     The definition of "solicitation" restricted by the buffer provision and the silencing provision does not provide a person of ordinary intelligence fair notice of what conduct is prohibited. It is so all-inclusive as to put nearly unfettered discretion in the hands of a police officer who sees a person experiencing homelessness communicating with someone more fortunate.

114.     The definition of a "request" triggering the silencing provision does not provide a person of ordinary intelligence fair notice of what conduct triggers the duty to stop soliciting. It is so all-inclusive that anyone unsuccessfully soliciting for more than a moment is subject to arrest on an officer's whim.

115.     The buffer provision and the silencing provision are impermissibly vague in violation of the Plaintiffs' right to due process under the Fourteenth Amendment to the United States Constitution.

116.     In the absence of prospective relief, Plaintiffs are likely to either refrain from protected speech, or else be ticketed and arrested in violation of their right to due process. Plaintiffs Tammy Kohr and Robert Colton seek declaratory and injunctive relief against the City of Houston.

### Count Four: Right Against Unreasonable Searches and Seizures
### 42 U.S.C. § 1983 and Fourth Amendment to the U.S. Constitution

117.     Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

118.     Plaintiffs Tammy Kohr and Eugene Stroman bring this claim on behalf of themselves and the prospective class.

119.     Unsheltered homeless people in Houston, including Tammy Kohr and Eugene Stroman, are involuntarily in public. They have no place else to store their possessions.

120.     It is unreasonable to seize private property belonging to unsheltered homeless people solely because it cannot fit into a three-foot cube.

121.     These threatened seizures violate the right against unreasonable seizures under the Fourth Amendment to the United States Constitution.

122.     In the absence of prospective relief, Plaintiffs and class members are likely to suffer seizure of their property in violation of the right against unreasonable seizures. On behalf of themselves and the prospective class, Plaintiffs Tammy Kohr and Eugene Stroman seek declaratory and injunctive relief against the City of Houston.

## REQUEST FOR RELIEF

Plaintiffs request that this Court issue the following relief:

1.      An order certifying the proposed class;

2.      An injunction prohibiting:

        a.      Enforcement of the prohibition on unauthorized use of fabric, metal, cardboard, or other materials as a tent or other temporary structure for living accommodation purposes or human habitation, under Houston Code of Ordinances Chapter 21, Article III, against any class member;

        b.      Search or seizure of private property of any class member on the sole basis that it does not fit in a container three feet high, three feet wide, and three feet deep, under Houston Code of Ordinances Chapter 21, Article III; and

        c.      Enforcement of Houston City Code Section 28-46 (Aggressive panhandling) and Section 40-27(b) (Impeding the use of a roadway).

3.      A declaration that the enjoined conduct violates the Plaintiffs' constitutional rights as alleged;

4.       An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

5.      Any other relief this Court deems just and proper.


Respectfully Submitted,

By:      /s/ Trisha Trigilio

Trisha Trigilio
Attorney-in-charge
State Bar No. 24065179
S.D. Tex. Bar No. 2461809
American Civil Liberties Union
Foundation of Texas
1500 McGowen Street, Suite 250
Houston, Texas 77004

Phone 713.942.8146

Fax 713.942.8966

ttrigilio@aclutx.org

Kali Cohn
Texas Bar. No. 24092265
S.D. Texas Bar No. 3053958
American Civil Liberties Union
Foundation of Texas
6440 N. Central Expressway
Dallas, TX 75206
Tel: 214-346-6577
Fax: 713-942-8966