UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |
|---|---|
| TAMMY KOHR, EUGENE STROMAN, and JANELLE GIBBS, on behalf of themselves and all others similarly situated, and ROBERT COLTON, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF HOUSTON, <br><br> Defendant. | Civil Action No. 17-cv-1473 |

## FIRST AMENDED COMPLAINT

1.      Hundreds of unsheltered homeless people live on the streets of Houston. At night, there is no place for them to turn, because Houston's emergency shelters are full. Demand is so high at shelters that people wait in line just to try to get a spot to sleep on the floor. Those who wind up stuck on the streets do their best to shelter themselves by "camping" in tents or other temporary structures.

2.      In an effort to sweep the evidence of homelessness from sight, the City of Houston has made camping or possessing too much property in public a crime. But homeless people who live on the streets don't have a choice about whether to comply with this law. They must meet their basic human need for shelter, and the only alternatives—emergency shelter beds—are full beyond capacity. Without permanent shelter, they have nowhere to store and access their few remaining possessions.  Houston's camping ban effectively criminalizes homelessness in violation of the Constitution.

3.     To make matters worse, Houston's camping ban was passed together with a ban on panhandling in many public areas of the city. This law literally silences homeless Houstonians in order to shield more fortunate people from speech that makes them uncomfortable. Restricting the speech of Houston residents who are in the most serious need is a blatant violation of the First Amendment.

## JURISDICTION AND VENUE

4.     This is a civil rights action arising under 42 U.S.C. § 1983 and the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and § 1343 (civil rights jurisdiction).

5.     Venue in this district is proper under 28 U.S.C. § 1391(b)(1), because the City of Houston resides in this district, and under § 1391(b)(2), because a substantial part of the events giving rise to the Plaintiffs' claims occurred in this district.

## FACTS

**I.     Plaintiffs Are Unsheltered Homeless People Whose Rights Are Violated by the Camping Ban and Panhandling Ban**

**A.     Tammy Kohr**

6.     Tammy Kohr has lived in Houston for the last five years. She moved to Houston to get far away from her abusive ex-husband, and she lost her most recent job when she went back to her home state to testify at his parole hearing. Despite her best efforts, she hasn't been able to maintain steady housing since.

7.     Prior to filing this action, Tammy lived in a tent in a public encampment in Houston. Tammy needed a tent to protect herself from the weather, insects, and wildlife, to get dressed in the morning, to keep her possessions safe, and to have privacy from other people.

8. Prior to filing this action, Tammy could not access an emergency shelter bed. She tried calling and waiting in line, but the shelters were always full. Once, when Tammy managed to get an overflow spot at a Star of Hope shelter, she had to wait in line for two hours. She got bedbug bites after sleeping on the floor.

9. Prior to filing this action, Tammy was involuntarily in public with nowhere else to go. She did not have access to her own private space where she could store and access her possessions. Tammy intended to keep using her tent for shelter, and to keep more possessions than can live in a three-foot cube, even if the City arrested her for violating the camping ban. The main thing she was concerned about keeping was her dignity.

10. Prior to filing this action, Tammy was in the process of choosing which of her possessions she would keep, and which the City would take indefinitely. She was worried about losing her clothes, her mattress, and her cooler that she used to keep drinks and meat cold. She did not know what would happen to her kitten. Most importantly, she was worried about losing her bike, which she and her boyfriend used to travel to job interviews, to housing assistance offices downtown, to shower facilities downtown and at Hermann Park, and to places that distribute food.

11. After Tammy filed this action and moved for class certification, the City procured a space for her in permanent supportive housing. Tammy had her first housing assessment with the City's Homeless Outreach Team (HOT) in October 2016. Although Tammy had several documented disabilities that qualified her for permanent supportive housing, she was repeatedly rejected from that program because her medical documentation was not from Texas.

12. The City cut through the red tape for Tammy shortly after she filed this case. A HOT officer told Tammy to go through another housing assessment, and on the basis of the same

documentation that had been rejected repeatedly, City contractors verified Tammy's disabilities and admitted her into City-funded permanent supportive housing.

13.     Tammy occasionally panhandles, sometimes with signs that say things to make people smile. At times, she panhandles near gas stations or ATMs. When she panhandles, she regularly steps into the street to accept money from people in cars.

14.     Tammy has respectfully and briefly persisted if people said no to her, to explain why she was asking for money. People often decided to give her money when they heard what she was asking for. It was important to Tammy that these people watch her buy what she had been saying she needed, because that makes people more likely to give to the next person in the future, and changes their point of view about why homeless people might ask for money in the first place. Tammy also wants to correct the misperception many people have that it is actually illegal for them to give money directly to a person on the street.

15.     Tammy doesn't panhandle as often anymore—she has been harassed by police officers, who claim that it is illegal to be asking for money, too many times. But Tammy has not yet found a job, and she needs money. She recently panhandled to try to get money for bus fare to travel downtown from her new apartment, and she is considering panhandling at walkable locations near her apartment. She is unsure how the panhandling ban restricts activity like holding a sign that says she needs help, or telling people about why she needs money. She fears that, due to increased enforcement efforts under the new anti-panhandling campaign, the police may arrest her for violating each provision of the panhandling ban in the course of her typical panhandling activities.

**B.** **Eugene Stroman**

16.     Eugene Stroman lives with his wife in a public encampment in Houston. He has a pet dog and he likes to barbeque. Gene makes money repairing bikes with spare parts he stores next to his tent. Despite his best efforts, Gene has not been able to find stable housing. Gene needs a tent to protect himself from the weather and insects, rats, opossums, and raccoons, and to have privacy from other people.

17.     Gene cannot reliably access an emergency shelter bed. He has repeatedly tried calling and waiting in line, but all the emergency shelter beds are full. Moreover, there is no available shelter that would accept Gene and his wife together—going into shelter means that they will be forced to separate.

18.     Gene has occasionally gotten an overflow spot in a shelter. Once, after Gene was admitted to a shelter, his eyeglasses were stolen. He also had trouble searching for a job while he stayed at the shelter, because he had to be in line by 2:00 PM to make sure he got a bed. Gene left the next day because he didn't want any more of his possessions to be stolen.

19.     In another shelter, Gene had to sleep on a mat on the floor in the kitchen, where he was bothered so much by the rats that he had to feed them in order to get them to leave him alone. He was also harassed by the staff, who told him that he would go to hell because he held different religious beliefs than the staff members. He left the next day because he couldn't tolerate living under those conditions.

20.     Last year, Gene had enough money to catch the train to Star of Hope Men's Shelter. He took the train uptown, walked to Star of Hope, and waited in line, but even after he waited, the shelter turned him away. The trip had been so taxing on Gene that he didn't have the energy to travel back home. He had to sleep at the train station near the shelter.

21.     Of course, the other emergency shelter for men—the Salvation Army Men's Shelter—is even farther away from Gene's encampment than the Star of Hope Men's Shelter. It is very difficult for Gene to travel to these shelters and wait in line, only to get turned away and stuck sleeping, without his possessions, in an unfamiliar part of town.

22.     Gene is baffled about how to prepare for enforcement of the camping ban. He does not have access to his own private space where he can store and access his possessions. He and his wife have started sorting through their possessions, but they can't decide what to keep. They have winter clothes that they would like to hang on to, but the clothes are bulky. Gene will probably have to abandon his nonperishable foods, including canned goods. He is also worried that he will have to abandon all his spare bike parts, and he won't be able to earn any more income from repairs.

23.     Gene is most worried about losing his bike, which helps him get around town. Having a bike is important to Gene, because he has congestive heart failure, and he gets weak when he walks too far. He needs a bike to get to the Houston Housing Authority and a food pantry he visits. Without income from repairing bikes, Gene isn't sure how he will be able to afford bus fare.

24.     Gene filed this action while living in public involuntarily with nowhere else to go. He intends to keep using his tent, and to keep more possessions than can fit in a three-foot cube, even if the City prosecutes him for violating the camping ban.

**C.     Janelle Gibbs**

25.     Janelle Gibbs lives with her boyfriend in a public encampment in Houston. She has spent most nights living in the encampment since February, shortly after she was released from prison. Despite her best efforts, Janelle has not been able to find stable housing.

26.    Janelle needs a tent for protection from the weather and pests, to give herself privacy, and to protect her possessions while she looks for a job. In Janelle's experience, she is very unlikely to get a job if potential employers can tell that she is homeless. Carrying her possessions to a job interview is a dead giveaway. Janelle also needs her tent to protect herself. Her doctor has prescribed her a sleeping medication that makes it very difficult for her to wake up for about six hours every night. She feels vulnerable taking her sleeping medication out in the open.

27.    Janelle cannot reliably access an emergency shelter bed. She has repeatedly tried calling shelters and waiting in line, but the emergency shelter beds consistently fill up, usually before she can get a spot. This year, Janelle has occasionally gotten a bed or an overflow spot in an emergency shelter, but she can never count on it. It's just a matter of luck. Once, a staff member at Sally's House, who has known Janelle for a long time, broke the rules and let her sleep on a couch.

28.    Janelle regularly tries waiting in line at the shelters, but it usually isn't worth it. There are just not enough spaces to accommodate all the people who need a place to sleep. Waiting in line means that Janelle has to lose an afternoon that she could otherwise spend working or searching for a job. The wait can also mean that Janelle has to stand outside in terrible weather—even if it's extremely hot, or a torrential downpour—in the hopes that she'll get a spot.

29.    The wasted time aside, some of the shelters are located in unsafe areas. The night that Janelle got out of prison, the first place she went was Star of Hope shelter, with her prison bags slung over her back. The shelter turned Janelle away because they were full—shelter staff wouldn't even let Janelle sit down to figure out what to do next. She was forced to leave the

shelter with her prison bags, and walk by the large, dark parking lots for Star of Hope and Minute Maid Stadium around 10:00 at night. Janelle feels scared when she has to walk to and from Star of Hope at night; she has heard of women being raped in the parking lots near the shelter.

30.     Even if Janelle manages to get a spot in a shelter, staying in an emergency shelter bed isn't a feasible long-term plan. If Janelle does get a job, it's not likely that she can take buses and trains across town to make it back to the shelter in time for check-in. To get a spot at most shelters, people have to wait in line starting around 2:00—and you can only wait in line for one shelter at a time.

31.     Finally, if Janelle sleeps at Sally's House, and she doesn't agree to enroll in their programming after a thirty-day period, she is banned from sleeping at the shelter for the next ninety days. Janelle was subject to a ninety-day ban starting in April.

32.     Janelle does not have access to her own private space where she could store and access her possessions. She has no idea how to protect herself from enforcement of the camping ban without putting herself at risk, and she cannot decide what property she would abandon for good. She has many important possessions that do not fit into a three-foot cube, like her clothes, her shoes, and her air mattress.

33.     Janelle is most worried about losing her bike, which helps her get around town. Janelle uses her bike to travel to the employment agency, the grocery store, the laundromat, and places where she can take a shower and charge her phone. She does not usually have money to take the train or ride the bus.

34.     Janelle and her boyfriend have considered finding somewhere to hide their possessions from the police, but they don't want to take that risk unless they absolutely have to.

It would be very hard for Janelle to replace any of her possessions. She has struggled to find

work, so much so that she has donated her plasma in order to make ends meet.

35.     Janelle is involuntarily in public with nowhere else to go. She has taken down her

tent during the day, but she puts it back up at night. Janelle intends to keep using her tent to

shelter herself, and to keep more possessions than can fit in a three-foot cube, even if the City

prosecutes her for violating the camping ban.

**D.     Robert Colton**

36.     Robert Colton is a veteran who has been in and out of homelessness for the last

five years. Right now, he is living in a tent, trying to get a steady income and access to affordable

housing. Robert has trouble supporting himself with full-time employment due to multiple

disabilities, including posttraumatic stress disorder and a hernia that requires an operation.

37.     Robert panhandles to get by. He usually panhandles near outdoor restaurants,

parking meters, and ATMs with a sign that says "Homeless vet needs help with food, clothes, $,

anything helps." Sometimes, he steps into the street to accept money from people in cars.

38.     Robert wants to communicate with passers-by about the fact that many homeless

people have fallen on bad times, and when they ask for money, they are only trying to have a

better life. He knows from his experience on the street that many police officers arrest

panhandlers to keep them out of highly visible areas, and the new speech restrictions are just the

latest version of laws authorizing the police to take homeless people to jail. Robert is also unsure

how the panhandling ban restricts activity like holding a sign that says he needs help, or telling

people about how he has fallen on hard times. He feels hesitant to continue panhandling because

he fears that, due to increased enforcement efforts under the new anti-panhandling campaign, the

police may arrest him for violating each provision of the panhandling ban in the course of his typical panhandling activities.

     **E.**     **Defendant City of Houston**

39.     Defendant City of Houston is a municipality organized under the laws of the State of Texas.

**II.**     **The Camping Ban Criminalizes Homelessness**

40.     On March 2, 2017, Mayor Sylvester Turner announced a six-point plan for furthering Houston's nationally recognized success in reducing homelessness. Mayor Turner stated that his vision was to "balance the needs of the homeless and the concerns of the neighborhoods they impact."

41.     The plan includes many evidence-based and compassionate policy choices, like expanding permanent supportive housing, and seeking additional funding for mental health and substance abuse treatment. But some aspects of the plan strike an unconstitutional "balance," allowing complaints from more fortunate constituents to outweigh the rights of their homeless neighbors. The unconstitutional aspects of the Mayor's plan are a ban on encampments and an "aggressive anti-panhandling campaign."

     **A.**     **The Camping Ban Criminalizes Use of a Tent and Accumulation of Certain Possessions in Public**

42.     One point of Mayor Turner's plan is to "compassionately redirect those in encampments" from "unacceptable locations" to "temporary, low-level shelters." The Mayor announced his intention to add more than two hundred emergency shelter beds by August, and in the meantime, to build an unspecified number of temporary shelters that house approximately seventy-five people. The Mayor also announced his intention to introduce an ordinance "outlawing tents or structures on public property."

43.     To the Mayor's credit, he repeatedly emphasized that people cannot be "redirected" if there is no place else to go. He stated candidly: "one of the reasons we are creating these temporary, low-level shelters, is that once we tell people no, you cannot be *here*, we also need to provide them with where they *can* be."

44.     The City of Houston has not constructed any new shelters since the Mayor's announcement. Nevertheless, until the City learned about this lawsuit, the City intended to enforce the camping ban immediately after it went into effect on May 12th.

45.     In response to this lawsuit, the City has voluntarily delayed issuing citations, in what appears to be a misguided attempt to avoid defending the constitutionality of the camping ban in federal court.

46.     The camping ban prohibits "unauthorized use of . . . a tent or other temporary structure for living accommodation purposes or human habitation" in public. Houston Code of Ordinances §§ 21-61 to -62.

47.     The camping ban prohibits "unauthorized accumulation of personal property (other than durable medical equipment) that would not fit in a container three feet high, three feet wide, and three feet deep" in public. *Id.*

48.     An officer may ticket people for these offenses after issuing a written warning and allowing a reasonable time to comply. *Id.* § 21-63. An officer may arrest people for these offenses if she issues the written warning, "attempt[s] to ascertain" whether the person may need emergency medical care or social services, and, if so, makes a "reasonable effort" to obtain assistance from the Houston Police Department Homeless Outreach Team or a designated outreach organization. *Id.* Nevertheless, arrest is permitted for someone who seems to be in need of services if the arresting officer cannot obtain outreach assistance, or outreach assistance

11

"direct[s]" the person to an appropriate provider, and the person "has not accepted the direction." *Id.*

49.     There are very few people employed as active street outreach providers in Houston. It is likely that officers' requests for outreach assistance will go unanswered, especially late at night and on weekends, which gives officers the green light to arrest someone for camping.

50.     It is unclear what happens if an outreach provider directs a person to a shelter, but no shelter is available—as will inevitably happen in many cases.

51.     It is unclear what happens if an outreach provider directs a person to shelter, and because of mental health issues, that person is not able to follow a provider's direction.

52.     The City has already taken action to remove any procedural barriers to immediate enforcement of the camping ban. Before this action was filed, the City had threatened Tammy, Gene, and Janelle, personally, with enforcement of the camping ban.

53.     In April 2017, soon after the camping ban was signed into law, Houston Police Department officers visited the encampment where Tammy, Gene, and Janelle live. The officers told Tammy, Gene, Janelle, and the other encampment residents that they would be prosecuted after May 12th if they did not stop sheltering themselves, stop cooking food, and get rid of possessions that did not fit into a three-foot cube. The officers also served Tammy, Gene, Janelle, and the other encampment residents with a written threat to enforce the camping ban, which read "**Starting on May 12th,** A City of Houston law will **prohibit encampments in public places** in Houston without permission from the City."

54.     Officers continued visiting the encampment to threaten enforcement of the ban throughout late April and May. Different officers threatened different types of enforcement, like:

12

Residents will be cited if they do not throw away enough of their possessions. Or: A dump truck will come through camp, and officers will grab anything that violates the ban and throw it into the dump truck. Or: Residents must choose property they want to discard and throw it into the dump truck themselves. In any case, officers continued to threaten residents of the encampment, including Tammy, Gene, and Janelle, with enforcement.

55.     In mid-May, Houston Police Department officers distributed a second written threat to residents of the encampment, including Janelle. It stated: "**WARNING: Encampment Violation.** A City of Houston law makes it illegal to encamp in a public place in Houston without permission from the City. **YOU ARE VIOLATING THIS LAW. . . . .** If you do not stop encamping in a public place, a police officer may: Give you a ticket . . . . [or] Arrest you and take you to jail.**"** Officers took pictures of people in front of their tents, and documented the names and locations of people in the encampment, to prepare to issue citations and make arrests.

56.     Officers are using the camping ban to skirt the rights of people in the encampment. One officer distributing written warnings has ordered residents in the encampment to hand over their identification, purportedly so the officer can record who is receiving a warning. But the officer is in fact using residents' identification to search for outstanding warrants. Gene has seen the officer distributing warnings arrest people who were ordered to hand over their identification.

57.     Officers distributing written warnings have tried to hide the City's intentions, claiming that encampment residents would have plenty of time to plan before officers actually wrote citations and arrested people. But when one encampment resident pressed an officer, noting, "You also said we're going to get a written warning before it could happen," the officer admitted, "Yeah, this is the fine print: this is—this *is* the warning. This is what the City is

releasing." For anyone who has received a written warning, the City is now poised to cite or arrest them at any time.

**B.     Houston's Unsheltered Homeless Population is Involuntarily in Public**

58.     According to the most recent and comprehensive data that are publicly available, there are more than 1,000 unsheltered homeless people in Harris County, the majority of whom reside in Houston. That was the statistic reported in the 2017 Point-in-Time Count.

59.     The annual Point-In-Time Count organized by the Houston Coalition for the Homeless is the most comprehensive count of Houston's unsheltered homeless population. To conduct the Count, agency staff and volunteers walk around Houston in late January to count all the unsheltered homeless people they can find. The Count is underrepresentative of the true number of unsheltered homeless people in Houston.

60.     Finding housing from a state of homelessness is a long process with many setbacks. For example, more than 28,000 families in Houston are on the waitlist for a Housing Choice Voucher, which is a federal program that helps low-income families pay for an apartment. In late April, due to budget cuts, these vouchers were rescinded from about 900 families in Houston who had finally made it to the top of the waiting list. Some of these families had already signed a lease, and watched their long-awaited apartment slip through their fingers.

61.     A temporary alternative to finding housing is an emergency shelter bed. Emergency shelter beds are what most people think of when they think of a homeless shelter. In theory, anyone who is homeless should be able to access these beds on an as-needed basis.

62.     The Way Home, Houston's Continuum of Care program designated by federal law to coordinate local homeless assistance services, refers homeless adults to emergency shelter beds in five different shelters:

     a. Star of Hope Men's Shelter (aka "Men's Development Center"),
     b. Star of Hope Women and Families Shelter,
     c. Salvation Army Men's Shelter (aka "Red Shield Lodge"),
     d. Salvation Army Family Shelter, and
     e. Salvation Army Single Women's Shelter (aka "Sally's House").

63.    The emergency shelter beds in Houston are full, and they have been full for years. The number of unsheltered homeless people in Houston far exceeds the number of available emergency shelter beds.

64.    When volunteers count unsheltered homeless people, they do not count anyone who is sleeping in a place fit for human habitation. At the same time that more than 1,000 people were counted as part of Harris County's unsheltered homeless population, there were more than 2,200 people who were counted as part of the County's *sheltered* homeless population, completely filling our limited emergency shelter beds.

65.    City policymakers know that the emergency shelter beds are full. That is why the Mayor proposed building hundreds of additional emergency shelter beds as part of his plan. But even if the Mayor fulfills his promise to build another 250 beds, there will still be hundreds of people in Houston left without shelter.

66.    The shelters are full so consistently that every shelter with emergency beds has a designated number of "overflow" spots. People in overflow spots are required to sleep lined up on the floor in whatever floor space is available. Sometimes, people spill into the kitchen.

67.    This practice is unsanitary, because the emergency shelters are built to house only one person per bed. The emergency shelters have dozens of overflow clients sleeping on the floor without adequate staff or bathrooms to serve that client population.

68.    The practice is also unsafe, because it poses a fire hazard to everyone sleeping inside the shelter.

69.     Putting these concerns aside, the overflow spaces are nowhere near sufficient to accommodate Houston's unsheltered homeless population. Each day, people wait in line outside each of the five emergency shelters at designated times in the morning and afternoon, and people in line are turned away for lack of space.

70.     Even if each shelter squeezed overflow clients onto every square inch of their floor space, which would be unsafe and unsanitary, the floor space in these shelters could not physically accommodate the hundreds of unsheltered homeless people in Houston.

71.     On the rare occasion when an emergency shelter bed opens up, it isn't necessarily "available" to any unsheltered homeless person. There are many barriers that, on their own or in combination, can make it impossible or unreasonably onerous for people to access shelter.

72.     Cost is a barrier. At the Salvation Army Men's Shelter, men are required to pay $10 a day after their first seven days in an emergency shelter bed. Most homeless people cannot afford this amount, especially given the new restrictions on panhandling.

73.     Criminal history is a barrier. None of the Salvation Army shelters, and none of the shelters that accept families, accept people who are registered sex offenders.

74.     Identification is a barrier. Some shelters require government-issued identification in order to enter. Getting identification can be a difficult process, depending on where you were born. It often requires obtaining certified medical records, school records, social security records, and/or a birth certificate.

75.     Employment is a barrier. Holding or searching for a job makes it difficult to access emergency shelter beds. All shelters offering emergency beds require clients to wait in line for a spot at some point during the day. Waiting in line during the day is difficult for people who are searching for work, and impossible for someone who works an overlapping day shift.

Sometimes, people face the choice of standing in line for emergency shelter or accepting a temporary job placement through Pacesetters, a temporary employment agency. Shelters also set a check-in deadline in the evening, which is impossible to meet for someone who works the night shift, or works late and needs to take a bus ride across town to the shelter.

76.     Travel is a barrier. The Wheeler encampment is about 22 minutes walking from the Salvation Army Family Residence, 1 hour and 25 minutes walking from the Salvation Army Men's Shelter, and 1 hour from the remaining shelters. The Minute Maid encampment is 30 to 45 minutes walking from the Salvation Army Family Residence and Men's Shelter, respectively. Anyone who goes to a shelter to wait in line needs to carry their possessions with them, or else hide their possessions and risk that they will be stolen. It is extremely difficult for people with mobility impairments, and no money for public transportation, to wait in line at shelters every day on the slight chance they might get a spot.

77.     Mental health problems and addiction are barriers. Two out of every five homeless Houstonians have substance abuse problems, and one in three has mental health issues. People with alcoholism are kicked out of shelters for being visibly intoxicated. People with mental health issues that manifest as aggression can be kicked out of shelters for getting into fights; in the case of paranoia, untrained shelter staff may perceive negative reactions to simple requests, like a request for identification, as a safety threat. People who need the freedom to go on a walk to calm down can't leave; each emergency shelter prohibits people from leaving the shelter from check-in time, which is in the evening, to check-out time, which is in the early morning. While the shelter does not physically prevent people from leaving, anyone who leaves is not allowed back inside. And finally, mental health problems can be an obstacle to connecting with shelters in the first place. As the Mayor himself acknowledged, for people with severe and

untreated mental illness, "even with everything we are doing, there will still be people—and I don't want to say choose to be on the street—but there will still be people who will be on our streets because of their status."

78.     Health and safety concerns are a barrier. For example, every shelter is infested with bedbugs, and people come out of shelters covered in bed bug bites. Lining overflow clients up on the floor is also a fire hazard.

79.     Property ownership is a barrier. Shelters also limit how much property a person can have to one or two suitcases. People are required to surrender their property to the shelter, including cell phones, and the shelter locks them away. It is also not uncommon for property to be stolen or accidentally returned to the wrong person. For a homeless person, having one of your few remaining possessions stolen—like a cell phone—can be devastating.

80.     Family structure is a barrier. The Star of Hope shelters regularly split up opposite-sex couples, even married couples with children, and send fathers and their teenage sons to the men's shelter. The result is that married couples, and mothers and sons, must separate from one another if they wish to access emergency shelter beds.

81.     Altogether, these barriers, whether standing alone or in conjunction, make shelter beds functionally unavailable to many unsheltered homeless people in Houston.

82.     Unsheltered homeless people in Houston are not in public by choice. By criminalizing possession of certain property in public, the camping ban effectively prohibits unsheltered homeless people from possessing that property at all. And by criminalizing the basic human need of sheltering oneself while in public, the camping ban effectively criminalizes homelessness altogether.

**II.     The Panhandling Ban Criminalizes Speech Based Solely on Its Disfavored Viewpoint**

83.     Another point of Mayor Turner's plan is "taking aim at panhandling" with an "aggressive anti-panhandling campaign." The Mayor specified that his goal was to "reduce and/or eliminate panhandling."

84.     As a part of this campaign, the Mayor announced that Houston would engage in extensive speech, including street signs, billboards, and TV, radio, print, and social media ads discouraging direct donations to homeless people.

85.     At the same time, the Mayor announced his intention to pass laws now codified at Houston Code of Ordinances §§ 28-46, 40-27, which restrict speech *encouraging* direct donations to homeless people.

86.     The law thus restricts expression of a dissenting viewpoint by those who are directly affected by the Mayor's campaign: people experiencing homelessness.

87.     More importantly, the law restricts speech that can be life-sustaining conduct. Close to 20% of Houston's unsheltered homeless population relies on panhandling as a source of income, often because medical conditions, or other barriers, prevent them from holding a steady job. Panhandling can make the difference between eating and going hungry, accessing fresh water or going without, or getting enough money to shelter oneself in a cheap motel room. By restricting panhandling, the City is burdening one of the few options for survival that unsheltered homeless people have left.

88.     The law restricts speech with content that qualifies as "solicitation," defined so broadly that it sets no clear bounds:

> *Solicitation* means the act of panhandling by seeking through a communication with another person, whether by gesture or verbally, funds or goods for food, personal favors (such as trips,

transportation, clothing, or other), drink, lodging, vehicle fare, or any other purpose to directly benefit an individual or his family members.

§ 28-46(a).

89.     The law prohibits this speech within eight feet of any "ATM, pay telephone, parking meter, parking fee collection box, transit facility, fuel dispensing device, or outdoor dining establishment, including, but not limited to, a sidewalk cafe." § 28-46(d) ("**buffer provision**").

90.     The law also prohibits this speech within eight feet of any person who gives an "imperative instruction, whether verbal or non-verbal," telling the speaker to stop. § 28-46(a). The speaker is required to "[i]mmediately . . . discontinue," and back more than eight feet away if she wishes to continue engaging in her protected speech. § 28-46(b) ("**silencing provision**").

91.     Finally, the law puts special restrictions on speech in a roadway, permitting people to block traffic to ask for donations to a charitable organization, but prohibiting people from blocking traffic to engage in speech with any other content. § 40-27(b) ("**roadway provision**").

92.     Each of these provisions applies to speech in public spaces throughout Houston, such as sidewalks, roadways, and parks, where the right of the people to express and exchange ideas is at its most robust.

93.     As Mayor Turner suggested when he introduced his anti-panhandling campaign, these speech restrictions are not designed to advance any legitimate government interest. They are designed to silence panhandlers and drive them away from visible areas in Houston.

94.     The City Council debate over the panhandling and camping bans revealed that the bans are motivated by community hostility to people experiencing homelessness. One

councilmember characterized many people in encampments as criminals to be eradicated, claiming that 38% of people in encampments are "con artists." Referring to taxpayers who chose to live in his district, the councilmember complained that these more fortunate people have to "walk out on Saturday and Sundays, and look at [people experiencing homelessness] day after day, night after night, weekend after weekend."

95.     A Museum Park District board member testified that when she saw tents popping up in the park, she started asking for ordinances to put a stop to it. She referred to people in tents as having a criminal element, and complained that no one would walk in the park as long as people in tents were there.

96.     Despite these characterizations of people experiencing homelessness as criminals, the City Council did not receive or discuss any evidence of a specific public safety issue resulting from the speech that they voted to criminalize.

97.     When a member of the public asked why there was no restriction specific to solicitation in the roadway provision, the Mayor responded: "There's a very thin line between penalizing speech. It was shifted to Transportation because you're dealing with the action that impedes public safety, which is much more defensible. That's the reason why we made the switch."

98.     Of course, this public safety rationale is a sham, because the roadway provision makes an exception for solicitation that the City does not consider to be objectionable. In fact, the City Council took time to express pride in some people who solicit in roadways, including the firefighters who "stand outside and collect change day in and day out." The City Council meeting paused to applaud firefighters for their solicitation.

99.     The general tenor of debate over these speech restrictions makes it clear that the restrictions are not designed to address a specific public safety issue. Instead, they are designed to shield more fortunate Houstonians from the discomfort of being confronted with the needs of their neighbors living in extreme poverty, and to restrict speech advocating for direct donations to people experiencing homelessness.

100.     These unnecessary speech restrictions impose a substantial burden on Plaintiff Tammy Kohr's and Robert Colton's speech.

**IV.     Class Action Allegations**

101.     The named Plaintiffs bring this action on behalf of themselves and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure. They seek to represent the following class:

> All people in Houston who lack a fixed, regular, and adequate nighttime residence, to whom the City has directed a written threat to enforce Houston Code of Ordinances §§ 21-61 to -62 (Encampment in a Public Place).

102.     This action is brought and may properly be maintained as a class action under Rule 23(a)(1)–(a)(4) and Rule 23(b)(2).

**A.     The Proposed Class Satisfies Rule 23(a)**

103.     Members of the proposed class are so numerous that joinder is impracticable. The City has directed written threats to enforce the camping ban against residents of at least two encampments. Together, these encampments are home to at least sixty unsheltered homeless people.

104.     Joinder is also impracticable because membership in the large proposed class is fluid. People enter and leave the proposed class every day. Monitoring for these changes, and

joining and dismissing plaintiffs repeatedly, would not be a practical way to manage this litigation.

105.    The relief sought is common to all members of the proposed class, and common questions of law and fact exist as to all members of the classes. Plaintiffs seek prospective relief from enforcement of the camping ban on a classwide basis.

106.    Among the most important, but not the only, common questions of law and fact are:

> a.    Are emergency shelter beds available to all homeless Houstonians?
>
> b.    Is sheltering oneself unavoidable because it is a basic human need?
>
> c.    Is it reasonable to search and seize private property on the sole basis that it does not fit in a three-foot cube?
>
> d.    Is prospective relief appropriate to stop the City of Houston from violating the Plaintiffs' rights?

107.    The named Plaintiffs' claims are typical of the claims of the proposed class members, and they have the same interests as all other members of the proposed classes that they represent. The named Plaintiffs' claims arise from the same course of conduct as claims of the proposed classes, and their claims are based on the same legal theories as those of the proposed classes.

108.    The named Plaintiffs are adequate representatives of the proposed classes because they are members of the classes and because their interests coincide with, and are not antagonistic to, those of the classes.

109.    The named Plaintiffs are familiar with the City of Houston's ordinances and practices challenged here and the constitutional protections they seek to vindicate. They are prepared to respond to discovery requests in this case. They are committed to fulfilling the role

and duties of a class representative protecting the fundamental constitutional rights of Houston's

unsheltered homeless population.

110.    The named Plaintiffs are represented by lawyers associated with the American

Civil Liberties Union Foundation of Texas, the National Law Center on Homelessness &

Poverty, and Dechert LLP. The named Plaintiffs and their attorneys will fairly and adequately

protect the interests of the members of the Class.

**V.    General Applicability, Rule 23(b)(2)**

111.     Class action status is appropriate because the City has acted and refused to act on

grounds generally applicable to the proposed class. The City's ordinances apply equally to the

class regardless of differences among class members.

112.    Plaintiffs seek final injunctive and declaratory relief protecting them from

violation of their constitutional rights.

113.    Injunctive and declaratory relief with respect to each claim would be appropriate

to the class as a whole. All members of the proposed class are entitled to the constitutional

protections Plaintiffs seek to enforce.

**VI.    Predominance and Superiority, Rule 23(b)(3)**

114.    The predominant questions in this case are whether municipal policies violate the

proposed class members' constitutional rights. This question is susceptible to generalized, class-

wide proof. There is no individualized evidence or legal argument required to succeed on such a

claim.

115.    A class action is superior to alternative methods of trying individual claims. In

this case, there is no realistic alternative for members of the proposed class to try their claims. As

unsheltered homeless people, members of the proposed class are not likely to be able to invest the resources necessary to retain an attorney or bring their claims pro se.

## CLAIMS FOR RELIEF

### Count One: Right Against Cruel and Unusual Punishment
### 42 U.S.C. § 1983 and Eighth Amendment to the U.S. Constitution

116.    The named Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

117.    The named Plaintiffs bring this claim against the City of Houston on behalf of themselves and members of the proposed class.

118.    Unsheltered homeless people in Houston, including the named Plaintiffs, are involuntarily in public. They have no place else to go.

119.    Sheltering oneself is not voluntary conduct. It is a basic human need, it is harmless, and it is an act integral to the status of homelessness.

120.    By punishing the act of sheltering oneself in public, Houston's camping ban effectively punishes the status of homelessness.

121.    In the absence of prospective relief, the named Plaintiffs and class members will be subject to a real threat of being ticketed and arrested in violation of their right against cruel and unusual punishment. On behalf of themselves and the prospective class, the named Plaintiffs seek declaratory and injunctive relief against the City of Houston.

### Count Two: Right to Free Speech
### 42 U.S.C. § 1983 and First Amendment to the U.S. Constitution

122.    Plaintiffs Tammy Kohr and Robert Colton incorporate by reference allegations in the foregoing paragraphs.

123.    Plaintiffs Tammy Kohr and Robert Colton bring this claim on behalf of themselves as individuals.

124.    "Solicitation" restricted by the buffer provision and the roadway provision is protected speech under the Free Speech Clause of the First Amendment.

125.    The buffer provision, the silencing provision, and the roadway provision draw distinctions based on the message a speaker conveys. They are content-based restrictions on speech in a traditional public forum.

126.    These provisions are not the least restrictive means of achieving a compelling government interest. They were adopted to restrict expression of a dissenting viewpoint, and to shield more fortunate Houstonians from the discomfort of a panhandler's message.

127.    The buffer provision, the silencing provision, and the roadway provision violate the Plaintiffs' right to free speech under the First Amendment to the United States Constitution.

128.    In the absence of prospective relief, Plaintiffs will either refrain from protected speech, or else be subject to a real threat of being ticketed and arrested in violation of their right to free speech. Plaintiffs Tammy Kohr and Robert Colton seek declaratory and injunctive relief against the City of Houston.

**Count Three: Void for Vagueness**
**42 U.S.C. § 1983 and Fourteenth Amendment to the U.S. Constitution**

129.    Plaintiffs Tammy Kohr and Robert Colton incorporate by reference allegations in the foregoing paragraphs.

130.    Plaintiffs Tammy Kohr and Robert Colton bring this claim on behalf of themselves as individuals.

131.    The definition of "solicitation" restricted by the buffer provision and the silencing provision does not provide a person of ordinary intelligence fair notice of what conduct is prohibited. It is so all-inclusive as to put nearly unfettered discretion in the hands of a police

officer who sees a person experiencing homelessness communicating with someone more fortunate.

132.    The definition of a "request" triggering the silencing provision does not provide a person of ordinary intelligence fair notice of what conduct triggers the duty to stop soliciting. It is so all-inclusive that anyone unsuccessfully soliciting for more than a moment is subject to arrest on an officer's whim.

133.    The buffer provision and the silencing provision are impermissibly vague in violation of the Plaintiffs' right to due process under the Fourteenth Amendment to the United States Constitution.

134.    In the absence of prospective relief, Plaintiffs Tammy Kohr and Robert Colton will either refrain from protected speech, or else be subject to a real threat of being ticketed and arrested in violation of their right to due process. Plaintiffs Tammy Kohr and Robert Colton seek declaratory and injunctive relief against the City of Houston.

### Count Four: Right Against Unreasonable Searches and Seizures
### 42 U.S.C. § 1983 and Fourth Amendment to the U.S. Constitution

135.    The named Plaintiffs incorporate by reference allegations in the foregoing paragraphs.

136.    The named Plaintiffs bring this claim on behalf of themselves and the prospective class.

137.    Unsheltered homeless people in Houston, including the named Plaintiffs, are involuntarily in public. They have no place else to store and access their possessions.

138.    It is unreasonable to directly seize private property belonging to unsheltered homeless people, or to force unsheltered homeless people to abandon their property, solely because it cannot fit into a three-foot cube.

139.    These threatened seizures violate the right against unreasonable seizures under the Fourth Amendment to the United States Constitution.

140.    In the absence of prospective relief, the named Plaintiffs and class members will be subject to a real threat of seizure and/or forced abandonment of their property in violation of the right against unreasonable seizures. On behalf of themselves and the prospective class, the named Plaintiffs seek declaratory and injunctive relief against the City of Houston.


**REQUEST FOR RELIEF**

Plaintiffs request that this Court issue the following relief:

1.    An order certifying the proposed class;

2.    An injunction prohibiting:

    a.    Enforcement of the prohibition on unauthorized use of fabric, metal, cardboard, or other materials as a tent or other temporary structure for living accommodation purposes or human habitation, under Houston Code of Ordinances Chapter 21, Article III, against any class member;

    b.    Enforcement of the prohibition on unauthorized accumulation of personal property that would not fit in a container three feet high, three feet wide, and three feet deep, under Houston Code of Ordinances Chapter 21, Article III, against any class member; and

    c.    Enforcement of Houston City Code Section 28-46 (Aggressive panhandling) and Section 40-27(b) (Impeding the use of a roadway);

3.    A declaration that the enjoined conduct violates the Plaintiffs' constitutional rights as alleged;

4.    An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

5.    Any other relief this Court deems just and proper.

Respectfully Submitted,

By:  /s/ Trisha Trigilio

Trisha Trigilio
Attorney-in-charge
State Bar No. 24065179
S.D. Tex. Bar No. 2461809
American Civil Liberties Union
Foundation of Texas
1500 McGowen Street, Suite 250
Houston, Texas 77004
Phone 713.942.8146
Fax 713.942.8966
ttrigilio@aclutx.org

Kali Cohn
Texas Bar. No. 24092265
S.D. Texas Bar No. 3053958
American Civil Liberties Union
Foundation of Texas
6440 N. Central Expressway
Dallas, TX 75206
Tel: 214-346-6577
Fax: 713-942-8966

Tristia Bauman
District of Columbia Bar No. 1016342
S.D. Tex. admission *pro hac vice* pending
National Law Center on Homelessness & Poverty
2000 M Street NW, Suite 210
Washington, DC 20036
(202) 638-2535 x. 102
tbauman@nlchp.org

H. Joseph Escher III
California Bar No. 85551
S.D. Tex. admission *pro hac vice* pending
Dechert LLP
One Bush Street
Suite 1600
San Francisco, California 94104
Tel.: 415-262-4500
Fax: 415-262-4555

Joseph M. Abraham
Texas Bar No. 24088879
S.D. Tex. Bar No. 2847789
Dechert LLP
300 West 6th Street, Suite 2010
Austin, Texas 78701
Tel.: 512-394-3000
Fax: 512-394-3001

Timothy F. Dewberry
Texas Bar No. 24090074
S.D. Tex. Bar No. 2885846
Dechert LLP
300 West 6th Street, Suite 2010
Austin, Texas 78701
Tel.: 512-394-3000
Fax: 512-394-3001

**Attorneys for Plaintiffs**